Mr. Clifford, when you're ready. Good afternoon. Good afternoon. May it please the court, and may it please the closing council. My name is John Clifford. I'm with the Minneapolis office of worship in Gould. I was first admitted to the bar of this court when the court was created some 25 years ago. So I'm pleased to be back. With me in the courtroom is Chester Krause, the applicant. Krause is the correct pronunciation. Krause. Spelled as Krause, but he pronounces it Krause, as did his father and grandfather. As it will be henceforth in this court. He's 84 years old, and I'm pleased that he's here today to join us. He's the applicant and appellant in this matter. This case really turns on one simple question. Was the applicant providing museum services on April 2, 2003, when he filed his trademark application with the Patent and Trademark Office, or not? If he was not, we lose. If he was, this case should be reversed, because the finding of the board that the application was void ad initio is clearly not supported by substantial evidence, and we argue that it should be reversed. The evidence is very clear, and I do have some small blowups in the days of high gas prices, and I mean smaller ones. All of these are in your briefs, but the thumbnails in the briefs are, at least to my eyes, a little hard. Maybe these will be a little bit better. I'll just use these. We're close enough to you that I think we can all see them pretty well. I was told by the clerk this afternoon that no one had ever used small blowups from the podium, and I said, well, I'm not going to make a new law today, am I? Maybe a new procedure. Anyway, moving on. The board, I think, gave improper weight to the expert testimony of Dr. Lyndell King, a museum scientist, if you will, PhD from the University of Minnesota. She's the curator and director of the Weissman Art Museum, a major museum in Minnesota. She has 25 years experience in teaching courses at the university level about museum science. She serves and has served on the American Museum Association accreditation board. This is a person experienced in evaluating museums. Her unqualified opinion was based on the information in the photographs and videotapes of the enterprise operated by Mr. Krause. He was providing a museum, and therefore was engaged in museum services. Normally, service marks are evidenced, or use of service marks is evidenced by things that show sale or advertising. That's typical service mark use is evidenced by materials that show sale or advertising. And the finding here was that this mark had never been advertised for museum services. Yes, and that's clearly erroneous. At the time of the filing, the collection was housed in these three large sheds. There was an outdoor sign advertising the collection. Interior, on a later date, is in this photograph. This is, in fact, the specimen that accompanied the trademark application. It shows Mr. Krause standing next to the outdoor sign. The sign is four feet by eight feet. It's a full sheet of plywood. Advertising signage is acceptable proof of use in any service mark application. And that's what the Trademark Office had. There clearly was a museum behind those shed walls. The board, I think, correctly found it. Well, there was a building that contained automobiles. Correct. Start from that. And military equipment. Military, jeeps, lots of vehicles. Engines, tractor engines, tractor components. Correct, and some of them were outside, at least at certain points in time. There was a Sherman tank there for many years. That was outside, didn't fit inside, perhaps. But there was a very large collection, hundreds of items, hundreds of vehicles, more hundreds of engines and tractor parts and things. The definition of the museum used by the board, and we embrace it, is an institution devoted to the procurement, care, study, and display of objects of lasting interest and value. By this or any definition, Mr. Krause was engaged in operating a museum. I think the important point is that the public was invited to see the collection for years before the filing date. Between 1,000 and 1,200 people, members of the public, toured the facility. They were invited in by the signage. They were invited in by reputation. Another important piece of advertising created and first used in 2002 or 2001 was this brochure that was at the facility. It listed most of the vehicles on display, and very importantly, had a map for how to get to Iola and how to get to the location, and had the telephone number so you could call Mr. Krause. If it wasn't open, he'd let you in. He could call and say, when can I come in? He'd make an appointment. He'd drive over there himself if the door was locked. Another important fact. But I take it there's no evidence that that brochure was ever available anywhere except at the premise. That's correct. It was picked up. It wasn't put out at car shows or sent in the mail or anything else, right? There's no evidence of that. It's kind of curious to have a brochure that shows you a map when the only people that are going to see it are people that are already there. His testimony, which is in the record, at appendix page 436, Mr. Krause's sworn testimony, we had a formal brochure in later years. It was a list of the cars we had in the collection, and we had a map that showed how you get to Iola. Question, how is that distributed? Answer, I expected that people would come through the collection, looking at it, and take one or more brochures with them to show their friends. Question, do you know when that brochure was created? Answer, no, I'm going to guess 2001 or 2002. So the brochures were circulated among friends of people who came. Iola's a very small town. Well, no, his testimony says he expected that would happen. It didn't say that happened. Correct, that's the testimony on how the brochures were distributed. That was expected. He expected that would happen, but that's different from testimony saying I handed it out to people who actually took it. Correct. There was an earlier brochure that did not have a map. They added the map for a reason for people to be able to find it. Correct, but the record doesn't contain any evidence that the brochure was actually distributed to people who took it home and showed it to other people. Correct, that's correct. So the evidence that we have is that the brochure telling you how to get there and telling you what number to call in order to get in was inside. Correct, but everyone in the town of Iola knew how to get a hold of Mr. Krause, and that the car collection was available for inspection. Another important point. Well, do we know that from the record? I mean, are you adding a few facts here to help out the substantial evidence case? No, I don't think so. Did I misread the record? I didn't see any testimony from people in town who said, I know what's out there, and I know what's in there, and cars that are fun to see. There were no witnesses who were townspeople at that time. I don't think you should be adding that to the record here, sir. I think it may be in the record, perhaps not in the appendix. Mr. Krause was deposed four times, I believe, in the two different proceedings. There's a lot of his deposition testimony, a lot of other people's testimony. An important fact that is in the record is he had two employees that he paid with his own money for years before the filing date. The buildings were open and unlocked during the 40 hours a week they worked. Let me be honest with you and tell you what the problem is, if you're just, it's just for one judge of court, which it's not, fortunately for you, you've got a greasy flagpole standard of review, substantial evidence. Because you can slide up and say there was much substantial evidence to support that this was a museum. But if there was substantial evidence to support the contrary view, namely that it wasn't a museum, you'll lose, even though there was substantial evidence in the record to support you. That's what I mean about the greasy flagpole. And so as I read the decision below, and again, I may have missed something, they say, well, we're going to look at some usual indicia of museums. They got regular hours. They've got real advertising for what they are. That's missing here. And I'm going to ask the other side what the additional evidence was, but there seem to be at least two, if not three, data points of information that the boarders are lying on, saying, well, if it's a museum, I would have expected to see this, right? You're not arguing, are you, that it was error for the board to conclude that the absence of any regular hours, you're not saying that was irrelevant, are you? I think it's relevant to the totality. The evidence included Dr. King's testimony, and I think she knows what she's talking about, that regular hours are not required to be a museum. There are many museums that don't have regular hours. All of her testimony is in the attendance. There's a museum she testified to and that Mr. Crousy testified to run by Oprah Winfrey, open one day a month. There are historical societies. Dr. King testified about local small museums run by a county historical society that may be open only one day a year when the town has its annual picnic. There's not a need for some minimal impact on commerce to be a viable business. Many of these are not businesses. Mr. Crousy never charged a fee. That's not required to be a museum. By the definition that everyone accepted, including the board, there's no requirement for open minimum number of regular hours. It simply has to be an institution with a collection, procured with care, displayed, taken care of. Nowhere in the definition does it say you must charge a fee or have regular hours or have paid staff. The problem, obviously, is that you have lots and lots of collections out there, collectors who are proud of their collections, and justly so, and are happy to show anybody who shows any interest the collections. Not all of those can possibly be museums, and so the problem is whether there's something more here than the collection of the sort that I just described. Even a pretty impressive collection by somebody who has a fair number of people that actually do have an interest in seeing what he has in his collection. I absolutely agree. There must be a minimum threshold. In my view, the threshold is, did he have signage? Did he have some form of advertising? Yes, he did. Did he have people of the public coming through in large numbers such that it was not a private collection? Yes, he did. His testimony unrefuted that he had 1,000 to 1,200 people each year for several years prior to the filing date. He was subject to all manner of regulations, federal employment laws. He bought cars across state lines, paid taxes on everything he ever bought, was not operating as a tax-free collection. I think the board was hung up on this issue too, and here's perhaps where they went wrong. Do you have any factors? You said signage, some form of advertising, public coming through in large numbers, not necessarily on a regular basis. To have a registrable mark, you must have interstate commerce effect, I think, to go into the Patent and Trademark Office to obtain a registration. He had the interstate commerce effect, and he had the outdoor signage. He also had indoor signage. Could he have paid for advertising? There was testimony from Mr. Krause, I never paid to place an ad. True. Many museums are tax-free. Maybe they get free advertising because they're a charitable organization. They don't pay for advertising either. Suppose that you've got, I mean, the number of possible hypotheticals are boundless, but here's what's troubling me about this distinction that we're grappling with here. I mean, suppose you've got, this case involves in part stamp collection, suppose you've got a person who runs a business as a stamp seller and buyer, and he has a couple of very valuable stamps, and in order to induce people to come into his business, he puts a little sign in the front, which is, see the, I forget what it's called, but the upside down biplane or whatever, the stamps, and he's got it in the back of his store, and people come in from time to time to see this. Has he got a museum, you think? Does he have a museum? Is he charging? No, no. He's doing all the things? No, he's hoping people will come in because then they'll look at his stamps and buy them, but this is just part of his collection, one or two stamps of very, very valuable, which people are sort of interested perhaps from time to time in taking a look at. Midwestern roots, your honor. Waldrug in South Dakota has a museum for people to come in as an attraction to come in and shop at the store. Waldrug, by the way, if it ever was a drugstore, it's not today, it's a tourist trap that sells all kinds of trinkets. They can have a museum room as part of Waldrug? But you'd say that this fellow who has a stamp that he will show you if you come in is running a museum. If it's one stamp. If he's got an institution and it's devoted to procurement, care, study, display. But the institution is not devoted to, I mean, it just happens to be in the back of his, he has a book in the back of his shop. The stamp is a draw for customers. I think Mr. Krause's case is much better because there was no commercial aspect at all. He was sharing the procurement. I presume your answer to Judge Bryce's hypothetical would be that his institution wasn't devoted to procurement. He took care of his two stamps. It was devoted to selling stamps. If he had a real collection of stamps that he was showing, the way Waldrug has rooms of Western artifacts, they're not in the museum business, but they have a museum as part of their commercial enterprise. Waldrug's a museum. Don't the automobile manufacturers keep copies of some of their old cars? I seem to recall that Dearborn, Ford's got a facility that you can go look at the cars. Correct. To my knowledge. I believe Ford has a museum in Michigan. And it's part of their public relations, etc. So if they fit the definition and they have an impact on interstate commerce such that they can file an application, I think they should have a registrable mark. I think we probably better move on and we'll restore your rebuttal time. Mr. Gilbert. Thank you, Your Honor. I think what's clear in this case is that the Trademark Trial and Appeal Board was very careful in its review of the documentary evidence in the case. They considered the testimony and the witnesses about that documentary evidence, and they provided a careful analysis of all the evidence. Can we just go down the data points? We know what it is that Mr. Krause thinks is in the record that would support, that would be substantial evidence to support his claim to providing museum services under the definition as of the key day. What's the substantial evidence in the record that supports the conclusion of the board that this is not a museum services? Certainly. Give them to me in specifics. Certainly. There is evidence of record that there was a sign at a facility in which the vehicles were stored. However, having some background about the purpose, in fact the stated intent of Mr. Krause with respect to that sign, is that it was posted because a political fundraiser was being held at the facility. And if you look at the photographs of the facility, you'll see it's one building, one storage warehouse-type building in what's essentially a farmer's field with multiple other similar-looking buildings. So Mr. Krause's testimony... It was... Is there an indication in the record as to whether the sign was up for a long time? I mean, you seem to be suggesting it was just put up for one purpose. It wasn't then torn down, I take it. No, no, Mr. Krause's testimony is that it was erected in about 2003. The exact time is unclear. For the purpose of telling people would know where to come to the political event as opposed to coming to look at the car. That's correct. That's at Appendix 419. But he left the sign up after the political event. Absolutely. So there is... Is the presence of the sign after the political event is over? Mr. Krause would say that constituted advertisement. Except that that was after the filing date of the application, number one, when it remained in place. And number two, one of the questions that the panel asked previously was is there any one particular factor that is necessarily outcome-determinative as to whether or not it is a museum. I think that answer is no. You have to look at all of the factors that are in evidence. What does the sign say? Does it invite visitors in? If you look at the photograph of the sign, there's no hours posted, there's no contact information as to who should be contacted to view this collection. What you're saying in essence is that stuff like the hours or the availability has to be posted somewhere. If you go by the Phillips Collection here in town, you'll see a great big sign that says Phillips Collection. It doesn't say anything about hours opening or anything else. You have to go up to the door to see a little sign. Certainly. But are you saying that the necessary indicia of a museum is that you state what hours, what your availability will be? I'm not saying that is necessary for you to be operating a museum. I'm saying if it had been stated, that would indicate that he was operating a museum. What about the brochure? I'm sorry, are you done with the sign? I'm done with the sign. What about the brochure? That struck me as the strongest piece of evidence, well, setting aside the number of visitors, but the strongest piece of physical evidence that suggested a museum type function. That brochure, according to Mr. Krause's testimony, was created in 2001 or 2002. The recollection is a little unclear. The further testimony about the brochure and the items listed in that brochure at appendix 436 to 437 reflects that the items in that  vehicles not only owned by Mr. Krause, but objects owned by Krause Publications, my client, and also owned by a third entity, the Krause Foundation.  given the longstanding relationship between Mr. Krause as the founder and my client, there was over a long period of time a commingling of items in this collection. That brochure, interestingly, not only listed items of Mr. Krause's, but also of my clients. At the time that it was created... Perhaps you're going to get there, but I'm not sure where you go with that argument. Where I go with it is if the term Krause was being used in commerce in connection with this museum, look at the contents of the museum and for a substantial period of the history of the collection, the vast majority of it was owned by Krause Publications. I see. In other words, you're saying that the brochure is just a demonstration. You're not saying that a museum ceases to be a museum because they have hanging on the walls pictures that are visiting. Don't belong to them. No, no, that's not what I'm saying at all. I'm saying what it is indicative of is that Mr. Krause himself had never intended to be providing museum services. Because he allowed somebody else's cars to be in there? Well, because not only that, but if you look historically... Why would his willingness to have somebody else's cars sitting besides his perhaps to allow for conversation about differences between them, to highlight the significance of it, why would the presence of somebody else's own vehicles cut against him in any circumstance? It would in the circumstance where he is claiming that this use is exclusively his. And if you look at the history of the company, this collection was really formed significantly. Where is the allegation that the use is exclusively his other than the fact that he wants to mark? He wants to mark for a collection that includes his stuff and some other people's stuff. I don't think there is that allegation. I don't know where you're going on why that's a negative factor for him that other cars were in the collection. The point is, and I'll try to be concise, is that throughout the history of this collection, as it shrank and grew over the course of years, in the 70s, through the 80s, through the early 1990s, this was a collection that was stored on Krause Publications property. Exhibited and taken care of by employees of Krause Publications. Then only after Mr. Krause ceased to be employed by the company, did it become his. There is some history here that I think is important to note about whether or not he himself from the earliest date, 1959 through 2003. He probably didn't need to say it was his before because he had control of the Aesop. When he lost control of the Aesop is when it all went downhill. I think more importantly about this brochure is what was done with it. It was given out to visitors who came to the facility. It wasn't provided at least there's no evidence of the record that it was provided to hotels or the Visitors Bureau or the Chamber of Commerce or otherwise mailed out to people who might come and see this as a local attraction. But isn't it reasonable to conclude that those publications were intended to be distributed? Otherwise, why would there be a map? I think maybe so visitors could return. It's all speculation. There's no testimony as to... But isn't that consistent with the functioning of a museum? To invite visitors back? To have visitors come, get a brochure, and then perhaps be interested in returning. That is one function that a museum could have. Absolutely. Why isn't that evidence of museum services? Having a brochure in and of itself I think is evidence of a museum service.  make any argument, but it seems to me that it's perfectly clear that there's quite a lot of evidence in the record that might suggest that this was a museum. That's fine. Your burden is to point to the evidence in the record that supports the conclusion it was not a museum. And I don't hear you telling me much except the fact that you don't like the sign because it was put up for a political event even though it did remain afterwards. And your answer there is, well, it was not up on the date the application was filed. So that may be... But what else? I think Mr. Krause's intention for the collection is clearly a record at A145. He states, I wanted a collection. It was a private collection. If I wanted to show it to somebody, I'd show it to them. If he had said I wanted to have a museum, he forgot to say the magic word. Is that your point on that piece of testimony? On that piece of testimony, if he had said I wanted to have a museum, that doesn't necessarily make it so. But it's more likely that he was operating a museum if he had said I wanted to operate a museum. But Duncan Phillips never called his collection a museum. Always called it a collection. Absolutely. I'm not familiar with that hallmarks of a museum. It is a museum. I apologize, I'm just not familiar with it. It's not quite the British Museum, but it's pretty impressive. It doesn't have cars, it has paintings. Certainly. And as further evidence, Mr. Krause even stated, I never advertised because it was a private collection. This was not something that was promoted to encourage visitors. There was a brochure that was given to people who visited the facility, but it's not the sort of thing that a typical museum does to promote its availability. We had a video, and the video was apparently for some type of an auction. A whole mess of people were in there. Now, is that pertinent to this discussion? I don't think so. That occurred in 2004. And I don't understand how it's pertinent to this operation of a museum. Outside the record period. The only way I see it as pertinent is it shows that he wasn't devoted to the procurement care and continual display of these vehicles when selling off the great majority of the overall collection. What is the state of the evidence as to the number of visitors? I guess that was Mr. Krause's testimony. Do you have any comment on his representation? Let me just say, the way it struck me is that a, I don't remember what the exact number was, but something like in the thousands or a thousand or so, per year. That strikes me as more than an occasional drop by. Is there anything else, any elaboration on that number? My only comment is that there is no elaboration or verification available on the record as to what that number is. That was in deposition? We're relying solely on the testimony of Mr. Krause. No one pursued that to find out. It was not pursued at the time. Finally, with respect to the testimony of Dr. King, there was the statement made about the total disregard of that testimony. I think if you look at what the board's decision was, they did in fact carefully consider her testimony and they considered our objection to it. In fact, we made a motion to strike it, which was denied and so the board did consider her testimony and accorded it the way that they thought was appropriate in view of the circumstances. Namely, one, that the information that she had to review was based on photographs that were taken in 2005, not 2003. Number two, that she did her own research and couldn't find that Mr. Krause's collection was listed in any list of common museums in the state of Wisconsin or otherwise. There is her testimony to that effect. Those are the reasons why the board ultimately looked at her testimony and did not afford it much weight, which I think is within its discretion as the fact finder to do. If there are no more questions, I would respectfully ask that this board affirm the decision on the basis of the substantial evidence that was before the board and the care that the board took in doing that evidence and reaching its factual conclusion. Thank you. Mr. Clifford, you have just three minutes. Thank you. I'll be very brief. In rebuttal, I would say perhaps counsel misspoke or was simply mistaken. The sign was up for years before the filing date. I believe he said the sign went up after the filing date. The specimen in the application included the signage on the filing date, so clearly the sign, it was winter. It's still snow on the ground. Was it put up before the filing date for the purpose of letting people know where to come to a political party? His testimony was he put the sign up because he was having the shindig. That was the motivation for the timing so they could find it. The people were coming to see the collection. It was bootstrapped into a fundraising event which had a bonus reason to go to see the collection. So it wasn't that the fundraising took place in an empty shed. The fundraising was at the collection because that's the excuse to go out and have the party. Was there evidence, and this is right at the edge of my recollection, but remind me if there was evidence that there were occasional events of that sort or was there only evidence of one shindig? Only one shindig. I guess the regular events were the parades, right? The cars were loaned out for parades. But that wasn't at his local account. Right. There's a jeep that was put at a veterans memorial for example. I remember that. There were other events, bus tours, car clubs would schedule a meeting. There was the Iola car show every year. People would go over and see this while they were in town. Those were not shindig events but they were other events. The other points I'd like to rebut is this. It's true. He spent no money on paid advertising. He spent money on a sign. He spent money on a brochure. But he had no revenue. He was not charging anyone anything. So to require to have a service mark that you have paid advertising is not the law and should not be the law. You can have a hairdressing shop or other service providing shop with a sign and word of mouth advertising only. That's a valid service mark. You have an impact on interstate commerce because you're treating customers or cutting hair from across state lines using instrumentalities of interstate commerce. You have a sign. Maybe you have a phone number but no paid advertising. Interstate commerce here is just that people will come to look at the cars. And they were using buses that were licensed by the interstate commerce commission. Buying and selling cars across state lines. They used gasoline in their car to get there. On your heart of Atlanta motel and Hollywood BBQ restaurant. Get the point. Last. Collection versus museum. That's semantics. That's a distinction without a difference. The Phillips collection is a wonderful analogy. But I have a collection but I sure as heck don't have a museum. I don't think it's semantics. There may be close questions but I think that we have a notion of what each one is. He chose to use the word collection. There's no requirement that he use the word museum. No, no. That's true. He used museum services because that's... The board didn't rule against him I think because he didn't use the word museum. He could have used the word museum if it was exactly the same thing. He wouldn't have been in any better shape. They parsed those two words I think improperly and said his sign didn't have the word museum on it. They held that against him because he didn't use the word museum on his signage or on his brochure. The way Dr. Phillips didn't use the word museum on his collection. Those are synonyms. His testimony was he considered them synonyms. He chose museum for the application because it was in the standard application manual. But you would agree with me, would you not, that not every collection is a museum. Absolutely. But even things that you would indubitably call collections. Here's the analogy that I would use with some trepidation. Imelda Marcos had a shoe collection and after she was deposed they turned it into a museum because people came to see the shoes. The shoes didn't change but bringing the public in allowing people to marvel at the opulence, etc. made it a museum. It was then for study. It was then for education and maybe humiliation of the political leaders. Bringing the public in is a key attribute of a museum. The board I think fell off the rails when they talked for two pages in the decision about Dr. King's Navajo rug collection in her home. And they said, and they concluded in their opinion, by her reasoning if she had informative placards next to her rugs it would be a museum. She still would have to bring people in. She still would have to have signage. If she had 1,000 or 1,200 people a year come see her collection of rugs and she had a sign out front and she did exactly what Mr. Krause did, then she too would have had a museum. They banked on Navajo rug collection of three or four exquisite pieces in our museum and they were right. But they held it against this applicant. They didn't use the word museum. They parsed museum and collection. They disregarded the unrefuted, although criticized testimony of Dr. King. We respectfully request reversal and instructions to the board to issue this mandate certificate. Thank you for your time. Thank you. I thank both counsel. The case is submitted.